UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MEHDI BELHASSAN,<br><br>    Defendant | No. 21-cr-10076-WGY |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The government respectfully submits this memorandum in connection with the sentencing of Mehdi Belhassan, which is set for January 11, 2024.

In October 2023, a jury found the defendant guilty of wire fraud, in violation of 18 U.S.C. § 1343. The offenses of conviction stem from the defendant's scheme to obtain money under the false pretense that he had a youth sports camp in Massachusetts for summer 2019. *See* Indictment ¶ 8 (ECF 1). The scheme to defraud victimized hundreds of parents who paid to send their children to the summer camp; Active Network ("Active"), a credit card processing company that received the parents' payments; and Itria Ventures ("Itria"), a financing company that provided funding to the defendant based on the future receivables of his non-existent Massachusetts sports camp. *Id*.

In total, the defendant's fraud scheme—and the relevant conduct, as defined by USSG § 1B1.3(a)—caused losses of more than $600,000. When the fraud scheme ended, the defendant left his victims with the losses, and he flew to Las Vegas for a vacation, during which he spent almost all the money he had left from his fraud on gambling, entertainment, and hotels.

The defendant's conduct in this case was egregious and merits significant punishment. Despite hearing the evidence at trial and the jury's verdict, the defendant continues to protest that lying to get money is not wrong, let alone criminal. That characteristic of this defendant shows that he needs specific deterrence and that the public needs to be protected from this defendant

because he refuses to acknowledge that he has violated the law or harmed anyone. He does not recognize the norms and values that his conduct violated, and he shows no interest in reconciling himself to the community he harmed. The sentence imposed should promote respect for the law both from the defendant and from the victims and, more broadly, the public, who are entitled to see that a defendant receives just punishment for the harms he has caused.

Accordingly, the government recommends that the Court impose a mid-guideline sentence of 63 months of incarceration. Should the Court determine that the defendant's offense level is lower than that calculated by the government, the government asks the Court to vary upward to ensure that the sentence both provides just punishment and specifically deters the defendant and protects the public from him.

After incarceration, the defendant should serve 36 months on supervised release.

The government asks this Court to order forfeiture in the amount of $443,346.61, which is the amount of fraud proceeds directly obtained by this defendant.

The government also asks this Court to order mandatory restitution of $572,834.94, plus prejudgment interest, payable immediately.

## THE OFFENSES AND RELEVANT CONDUCT

The defendant was the owner and operator of MB Sports Camps, which ran youth summer camps. (Presentence Report ("PSR") ¶ 8.) For several years before 2019, the defendant operated his sports summer camp at Curry College, in Milton, Massachusetts. (*Id*. ¶ 9.) At the end of the 2018 camp, however, Curry College ended its relationship with the defendant because he had not paid the college pursuant to his contract for 2017 and 2018, and he owed the college over $400,000. (*Id*.) After August 2018, the defendant did not have a venue for MB Sports Camps in

Massachusetts or anywhere else for the summer of 2019. (*Id.* ¶ 10; *see also* Trial Ex. 6.)[1] Nevertheless, he promoted the camp for the 2019 season, at his "legendary Boston location," as well as at two out of state locations. (PSR ¶¶ 10-12; *see also* Trial Ex. 30.) In fact, the defendant did not have arrangements to hold his camp at any location for 2019. Instead, the defendant misled parents, for example, by promoting his camp using pictures that showed the Curry College location. (PSR ¶ 12.)

The defendant did discuss his camp with Stonehill College in Easton, Massachusetts. He then announced to parents that MB Sports Camp would be at the college in July 2019. When he did so, he had no contract with the college and never reached any agreement with Stonehill College to have his camp in Easton in July 2019. (PSR ¶¶ 13, 15.)

Around the same time that the defendant was negotiating with Stonehill College to have his camp in July 2019, the defendant also negotiated the sale of pre-registrations for a camp in June 2019 in Boston with Active. In fact, he did not then have a location in Boston or any plans to run camps there in June 2019. Through this fraud, the defendant obtained $121,124 from Active. (PSR ¶ 14.)[2]

In March 2019, Stonehill College decided not to host the camp; and the defendant and his assistant then turned to Northeastern University. The university offered to rent dormitory space and to provide meals to campers at the university's cafeterias, but the university could not, and did not, offer the defendant use of any of its sports facilities. (*Id.* ¶¶ 16, 18.) Nevertheless, while lacking any agreement whatsoever with Northeastern University, Belhassan and his assistant announced to parents that MB Sports Camp would in fact be at the university in 2019. (*Id.* ¶¶ 17,

---

[1] This memorandum refers to exhibits admitted at trial as "Trial Ex. [No.]" and to exhibits marked for trial, but not admitted as "Trial Exhibit [Letter]." The government has submitted exhibits that are spreadsheets both as PDFs and as Excel files.

[2] At trial, along with documents, testimony from Farid Kiblawi of Active established these facts.

20.)  Specifically, even after Northeastern University clearly told the defendant that it could not offer any sports facilities, the defendant and his assistant sent a message to parents stating, in relevant part, "We are going to be using Northeastern University for our lodging, food and sports. We will also be using other sports facilities very close to Northeastern University," and "Being at Northeastern University does mean that we will have limited space for day and sleepover campers. Therefore, I would recommend that you sign up as soon as possible."  (Trial Ex. 31.)  That message to parents was false, and his request that parents sign up "as soon as possible" aimed to get money based on a lie.  Moreover, within days of that message, the City of Boston told Belhassan that he could not have his camp anywhere in Boston because he lacked the appropriate permits.  (PSR ¶¶ 18-19.)  At that point, MB Sports Camp was effectively dead in the water in Massachusetts.

Nevertheless, despite knowing that he did not have a location for his camp at Northeastern University and could not hold his camp anywhere in Boston, the defendant continued to promote the camp and to obtain payments from parents for the 2019 camp.  (*Id*. ¶ 20; *see also* Trial Ex. 84 ("We are at [N]ortheastern [U]niversity[,] and we are using their facilities.")  At the end of May 2019, his assistant told the prior year's camp staff, "'MBSC' will not be hosting its own camp this year."  (Trial Ex. 82.)[3]  Yet the defendant and his assistant continued to tell parents that the camp would happen and would be at Northeastern University.  (PSR ¶ 22.)  For example, on June 7,

---

[3] In mid-May 2019, MB Sports Camps also cancelled its purported camps in Georgia and in Florida.  Trial Exhibit BW includes payments for 16 campers who appear to have registered for the non-Massachusetts locations, but it does not show refunds.  MB Sports Camps appears to have tried to fold the Georgia and Florida campers into the Boston camp, for which there was no location.  *See* Exhibit, Sample Georgia and Florida Emails.  Trial Exhibit BW contains a handful of reversed charges on or about the mid-May date of the cancellation of the purported Georgia and Florida camps, but it then shows new charges for the Boston camp.  For example, as seen in the sample emails and in Trial Exhibit BW, victim JG originally paid for camp in Georgia on April 30, 2019, then received notice of the cancellation in Georgia on May 16, 2019, then communicated with Belhassan's assistant the next day, and had her payment transferred to the purported Boston camp; in the same email chain, on June 4, 2019, when JG asked where the Boston camp would be, Belhassan's assistant answered, "Northeastern University."

4

2019, Belhassan asked Active to expedite payments from parents because "[c]amp is starting soon[,] and we can't afford to receive payment every 10 days or two weeks." (Trial Ex. 13.)

On June 25, 2019, Northeastern University learned that the defendant continued falsely to represent that the university would host the camp, and Northeastern University told the defendant to stop. (PSR ¶ 22.) Still Belhassan did not stop. (*Id.*) On June 26, 2019, the defendant asked a person registering campers from abroad to hurry up and to pay. (*See* Trial Ex. 79 ("Attached please find the invoice for summer 2019. [P]lease submit payment upon receipt or as soon as possible[.]") When he asked for payment, he knew he had no camp.

On June 28, 2019, the defendant and his assistant worked on a draft letter to parents cancelling the camp, but even then, the defendant continued the fraud and asked Active for an advance on payments from parents, all for a camp he knew he was cancelling. (PSR ¶ 22.) When Active said no, the defendant turned to Itria, and telling the same lie—that he would have his camp in Massachusetts in 2019, but now at Curry College—the defendant obtained $68,100 based on future receivables for the camp he knew he would not hold. (PSR ¶ 24.) In fact, Belhassan lied to Itria about the camp on the same day, that he told parents that the camp for 2019 was cancelled. (*Id.*) As part of his fraud on Itria, Belhassan submitted a false and forged contract between MB Sports Camps and Curry College (*id.*), and Belhassan told Itria that his "revenue from now until September will exceed 1 Million [sic]" because he was "just getting in [his] busy season" (Trial Ex. 22.) That statement was false, but the fraud succeeded, and he got his money.

When Belhassan told these lies, he had no expectations of any revenues from the camp. He had no location, he had cancelled his staff, and he had no money to run a camp because he had spent it all. (PSR ¶ 26.) While Belhassan was lying to Itria, his MB Sports Camp bank account was overdrawn, with a negative balance of $1,605.24. (Trial Ex. 87 at 134 (July 1, 2019).)

Belhassan's bank records show that by July 1, 2019, Belhassan had received $377,561.41

in payments through Active for the 2019 camps. (*See* Decl. of John Harger ¶ 5 (ECF 146).) Active records show that it received $390,305.05 (net) in registration payments from parents and $104,596.50 (net) in activities payments from parents. (*See* Trial Exhibit BW.)[4]

On July 3, 2019, Belhassan obtained $68,100 from Itria. He spent most of that money in Las Vegas, Nevada, on a trip he booked on June 25, 2019. (PSR ¶¶ 23, 26.)

The defendant did not refund money to the families of campers or to Active for payments he received before cancelling the camp. (PSR ¶ 27.)

## SENTENCING GUIDELINES

Legal Standard

At sentencing, a district court must first calculate a defendant's offense level to establish a guideline sentencing range. *Gall v. United States*, 552 U.S. 38, 49 (2007). The government must prove "sentencing enhancement factors by a preponderance of the evidence." *United States v. Almeida*, 748 F.3d 41, 53 (1st Cir. 2014) (quoting *United States v. Walker*, 665 F.3d 212, 232 (1st Cir. 2011)); *United States v. Irizarry-Sisco*, No. 19-1763, 2023 U.S. App. LEXIS 31147, at *25 (1st Cir. Nov. 22, 2023) (burden of proof at sentencing is "a preponderance of the evidence" (quoting *United States v. Alejandro-Montañez*, 778 F.3d 352, 361 (1st Cir. 2015)); *United States v. Carvajal*, 85 F.4th 602, 610-11 (1st Cir. 2023) (same); *United States v. Colon-De Jesús*, 85 F.4th 15, 21 (1st Cir. 2023) (same).

In determining the applicable sentencing enhancements, a district court can rely on any evidence it deems to be sufficiently reliable, regardless of admissibility at trial. *See United States v. Padilla-Galarza*, 990 F.3d 60, 89 (1st Cir. 2021) ("At sentencing, the Federal Rules of Evidence

---

[4] Evidence admitted at trial proved that Active was refunding payments along the way and reducing transfers to the defendant to account for the refunds. *See* Trial Ex. 10 (email to Belhassan, June 28, 2019, at 4:29 pm.).

do not apply." (citation omitted)). Similarly, "a defendant's Sixth Amendment right to confront the witnesses against him does not attach during the sentencing phase." *United States v. Tardiff*, 969 F.2d 1283, 1287 (1st Cir. 1992) (citations omitted)); *see also United States v. Bramley*, 847 F.3d 1, 5 (1st Cir. 2017) ("At a sentencing hearing, neither the Federal Rules of Evidence nor the Sixth Amendment right to cross-examination apply." (citing *United States v. Rodriguez*, 336 F.3d 67, 71 (1st Cir. 2003)).

Guidelines Calculation

The defendant's base offense level is 7, because the defendant was convicted of wire fraud, an offense referenced to USSG § 2B1.1, which has a statutory maximum sentence of 20 years of incarceration (USSG § (a)(1)). *See also* PSR ¶ 34.

The defendant's offense level is increased by 14, because he caused a loss or intended to cause a loss of more than $550,000, but not more than $1,500,000 (USSG § 2B1.1(b)(1)(H)). *See also* PSR ¶ 35. In support of this enhancement, the government relies on the affidavits provided by Active and by Itria. *See* Affidavits of Farid Kiblawi and Harrison Smalbach, submitted under seal pursuant to 18 U.S.C. § 3664(d)(4). The government also relies on the trial testimony of Farid Kiblawi for Active as well as Trial Exhibit BW, which shows payments received and refunded by Active; and on the trial testimony of Harrison Smalbach for Itria. Trial Exhibit 87 (at 121) shows a direct transfer of $3,400 from victim-parent JCZ to Belhassan's bank account on June 14, 2019. These materials prove the following losses:

| Loss | Amount | Source |
| --- | --- | --- |
| Parent Payments to Active | $494,901.60 | Trial Exhibit BW / Kiblawi Affidavit |
| Unsold Active Registrations | $43,487 | Kiblawi Affidavit |
| Itria Funding | $65,785.20 | Smalbach Affidavit |
| JCZ Payment to Defendant | $3,400 | Trial Exhibit 87 |
| **TOTAL** | **$607,573.80** | |

The defendant objected to the loss calculation in the PSR on the basis that some losses were not

relevant conduct.  However, under USSG § 1B1.3(a)(1)(A), the defendant is responsible for "all acts . . . committed, aided, abetted, counseled, commanded, induced, or willfully caused by the defendant."  Moreover, relevant conduct includes for all offenses that would group under USSG § 3D1.2(d), all acts that "were part of the same course of conduct or common scheme or plan as the offense of conviction."  USSG § 1B1.3(a)(2).  Acts are closely related as relevant conduct if they are "substantially connected to each other by at least one common factor, such as common victims, accomplices, purpose, or similar *modus operandi*" or if they are "part of a single episode, spree, or ongoing series of offenses" based on the similarity of the offenses, the regularity of the offenses, and the time between them.  USSG § 1B1.3, Application Note 5(B).  Here, the fraud on Active and on Itria was charged conduct in the Indictment and is intrinsic to the scheme.  The parents who paid for camps outside Massachusetts were the same kind of victims as those who paid for the Massachusetts camp.  They paid based on a comparable lie, promulgated by similar means, and they suffered their losses contemporaneously with the charged scheme to defraud.  As noted herein, some parents had their registration payments transferred to the purported Boston camp at Northeastern.  Accordingly, the Court should count all losses.[5]

The defendant's offense level is increased by 2 because the crime involved 10 or more victims (USSG § 2B1.1(b)(2)(A)(i)).  *See also* PSR ¶ 36.  In support of this enhancement, the government relies on the evidence submitted at trial.  *See, e.g.*, Trial Exs. 15 and BW (including far more than 10 victims).  At trial, the Court also heard from witnesses representing Active and Itria and from five parent victims.  With this memorandum, the government has submitted letters to the Court from an additional 10 victims, along with materials received from many others.

The defendant's offense level is increased by 2, because he was the leader, organizer,

---

[5] The government has not included as loss any amounts paid back before the defendant was charged.

manager, and supervisor of person participating in criminal activity, specifically his assistant who deceived parent-victims about the camp. *See* USSG § 3B1.1(c)). "One may be classified as an organizer, though perhaps not as a leader, if he coordinates others so as to facilitate the commission of criminal activity." *United States v. Tejada-Beltran*, 50 F.3d 105, 112 (1st Cir. 1995)). In *Tejada-Beltran*, the First Circuit applied the enhancement where the record showed "directly or by fair inference, that [the defendant] orchestrated the entire scheme, played a pivotal role in committing the crimes, made decisions about when and where unlawful [acts] would be attempted, recruited accomplices, and retained a degree of control over at least one of them." *Id*. at 113.

In this case, the evidence at trial proved that Belhassan organized and directed his assistant's activity in furtherance of the scheme to defraud. Evidence received at trial showed that the assistant falsely told victim parents that the camp would happen in 2019 at Northeastern University and assisted the defendant in getting money for the camp in 2019 at Northeastern University after she knew that there would be no camp at Northeastern University and after she told the former year's staff that there would be no camp in 2019. Based on the evidence at trial, including email traffic, the assistant was Belhassan's agent in operating his business, and she acted at his direction and under his control in making false representations to obtain parents' payments. Accordingly, consistent with *Tejada-Beltran*, the enhancement should apply.

The defendant has not accepted responsibility. *See also* PSR ¶ 42. The defendant has not truthfully admitted the conduct comprising the offenses of conviction, and in his objections to the PSR, he falsely denies and frivolously contests the full scope of his crimes. Application Note 2 to USSG § 3E1.1 unambiguously states that, except in "rare circumstances," the Court should not adjust the offense level for "a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." This defendant remains defiant, after conviction, and the Court should not

apply the adjustment absent a factual basis proving the applicability of USSG § 3E1.1. *See United States v. Maisonet-Gonzalez*, 785 F.3d 757, 764-65 (1st Cir. 2015) (agreeing that a reduction for acceptance of responsibility should not apply to a defendant who minimized his culpability at sentencing).

Accordingly, the defendant's total offense level is 25, with a sentencing range of 57 to 71 months.

## SENTENCING RECOMMENDATION

The Court should sentence the defendant to 63 months of incarceration and 36 months of supervised release and should enter orders of forfeiture and of restitution in the amounts of $443,346.61 and $572,834.94, plus prejudgment interest and payable as specified below. This sentence is just and satisfies the goals of sentencing under 18 U.S.C. § 3553(a), as detailed below.

<u>Nature and Circumstances of the Offense and the Defendant's Characteristics</u>

The defendant comes from a healthy and supportive family. (PSR ¶ 52.) He does not have significant mental or physical ailments. (*Id.* ¶¶ 65-66.) He excelled in school and has a college degree. (*Id.* ¶ 73.) He is a skilled tennis player and coach. (*Id.* ¶¶ 53-54.) The defendant knew how to run a business. (*Id.* ¶ 76.) In short, the defendant is smart and capable, and there is no excuse for his decision to defraud his customers, Active, and Itria by lying about his camp in 2019. He knew what he was doing when he made false statements in 2018 and 2019 to keep bringing in money. He knew he needed a location, but did not have one. He knew he needed a staff, but did not have one retained. And he knew he needed money to run the camp, but he had no money to do so because he spent it. This was business fraud.

<u>Seriousness of the Offense</u>

By the end of the 2018 camp season, the defendant's business was failing, and his solution was to lie to get money. By May 2019, Belhassan knew that the jig was up and that he was going

to harm his clients. He did not stop, when he had every reason to stop. And the harm was more than financial. Families arranged summers for their children based on his lies. Families were sending their children, in many cases from out of state or out of the country to attend his non-existent camp. As smart and capable as he is, Belhassan had to understand the financial harm and difficulty he would cause and the distress he would cause when he finally revealed that there would be no camp. And he knew there was no money for refunds or any prospect for getting money for refunds. He did not care.

### Specific Deterrence

Reputational harm and damage to future business prospects might deter fraud, but Belhassan has shown that he will not be deterred. By May 2019, Belhassan knew there would be no camp in 2019. He had every reason to stop the financial harm and to try to make amends. But this was not business. It was fraud. Belhassan carried on because he thought there would be no real consequences. When Belhassan asked Active to send an advance on expected payments at the end of June 2019, he knew there was no camp. Those payments would have been additional money from families trying to send their children to his cancelled camp. Belhassan did not care. He wanted the money. Then after he cancelled the camp, he got more money from Itria based on anticipated revenue from the cancelled camp. It was fraud. He could do it; so, he did. Belhassan only stopped getting money through lies because he ran out of time. The camp was scheduled for July, and it was July. It is apparent that Belhassan did not have any internal check on his criminal conduct, neither business sense nor moral conscience. That lack of conscience represents a danger to the public. Belhassan's utter lack of concern for the harm he caused justifies and requires a sentence that teaches him that stealing is wrong and that he must never again engage in fraud.

### Unwarranted Disparities in Sentencing

The government's recommended sentence would not create an unwarranted disparity in

sentencing. It is challenging to find "apple to apple" comparisons for sentencing. Based the Commission's data, 98 percent of defendants at offense level 25, in criminal history category one, get sentences of incarceration. The average and median length of imprisonment are 41 and 42 months, respectively. But this is not an average or median case. Belhassan victimized hundreds of families, as a business owner, and as noted above, he did so with no apparent moral hesitation. He is dangerous, and given the sharp need for deterrence, this Court is justified in sentencing this defendant to a middle of the guidelines sentence, as requested by the government.

## FORFEITURE

Forfeiture is mandatory in this case under 18 U.S.C. § 981(a)(1)(E), which requires forfeiture of all monies obtained by a defendant from a scheme to obtain money by means of false or fraudulent statements. The government has submitted affidavits from FBI Forensic Accountant John Harger detailing monies the defendant received from Active and from Itria, as well as affidavits from the representatives of those companies. The affidavits establish that the defendant directly obtained $443,346.61 as result of his false representation that he would have a youth summer camp in the summer of 2019.

## RESTITUTION

Restitution is mandatory for all losses caused to victims of a wire fraud scheme. 18 U.S.C. § 3663A(a)(1) and (c)(1)(a)(ii). In determining the amount of restitution, a court only needs a "modicum of reliable evidence," and it does not need "absolute precision." *United States v. Naphaeng*, 906 F.3d 173, 179 (1st Cir. 2018). However, the government must prove actual damages by preponderance. *Id*. The court should not order restitution for a loss without an adequate causal link to the crime of conviction. *Id*. An award cannot be speculative and be a "windfall." *United States v. Carrasquillo-Vilches*, 33 F.4th 36, 46 (1st Cir. 2022). As the First Circuit explained in *United States v. Corey*, the government must "show not only that a particular

loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal nexus between the conduct and the loss is not too attenuated (either factually or temporally)." 77 F. App'x 7, 10 (1st Cir. 2003).

To prove the amount of restitution here, the government has submitted affidavits from Active and from Itria, claiming losses respectively of $304,378.54 and $65,785.20.

In addition, the government has submitted Trial Exhibit BX, which shows payments from parents not refunded by Active, amounting to $182,620.20.[6] Trial Exhibit BX names unrefunded victim-parent payors and specifies the amounts. For example, it shows that, consistent with their trial testimony, three testifying parents, CL, CK, and MJ (or their spouses) did not receive refunds. The government also submitted materials received from several victim parents that corroborate Trial Exhibit BX. The United States submits that the Court should therefore order restitution to all of the parents listed in Trial Exhibit BX for the amounts listed therein.[7]

Restitution should also be paid to victim DT, who paid $1,065 for the camp in Massachusetts in 2019. In July 2019, DT received a chargeback for $1,065, but in August 2019, that chargeback was reversed. *See* Exhibit, DT Interview.

Bank records and email also show that the defendant directly received payment from at

---

[6] The government has notified all known victims using information from Active records and from the investigation, but the government has not received restitution claims from all victims. Under 18 U.S.C. § 3771(a)(6) and (d)(1), all victims have the right to "full and timely restitution as provided in law," and the "attorney for the government" may assert any victim's right to restitution.

[7] All of the victim materials received by the government have been submitted to the Court and forwarded to the defendant. The United States has not included any claims for restitution where Active records show that the parent received a chargeback from Active for the full amount of their payment. The government could not determine restitution amounts for numerous victims not included in Trial Exhibit BX, specifically those who did not respond to government inquiries and were not included in Active's list of parents who did receive chargeback refunds (Trial Ex. 15). The government cannot determine if any of the parents who did not get chargebacks and were not identified by Active as not receiving refunds received compensation from other sources. The government has not included claims for losses other than payments to Active or to the defendant.

least one victim-parent, JCZ, on or about June 14, 2019. *See* Trial Ex. 86 (referring to registration for victim JCZ) and Trial Ex. 87 at 121 (showing transfer of $3,400 from JCZ to Belhassan on June 14, 2019).

Finally, the government received information from eight victim parents, who made restitution claims, but were not listed as unrefunded in Trial Exhibit BX. For those victims parents, the government requests restitution in amount paid to Active, as seen in Trial Exhibits 15 or BX, minus any chargebacks in Trial Exhibit 15. The government has submitted a chart that summarizes the claims for these parents: CC, AL, ALG, DT, LT, RT, and JV. The total of their restitution is $15,586. *See* Exhibit, Add'l Victim Summary.

In total, the government requests an order of restitution for $572,834.94, plus pre-judgment interest, payable as follows:

| Entity/Person(s) | Amount |
|---|---|
| Active | $304,378.54 |
| Itria | $65,785.20 |
| Unrefunded Victim-Parents | $182,620.20 |
| Victim DT | $1,065 |
| Victim JCZ | $3,400.00 |
| Victims CC, AL, ALG, DT, LT, RT, and JV | $15,586 |
| **TOTAL** | **$572,834.94** |

In this case, the restitution order should include prejudgment interest from the dates of the victim's payments, or at least from July 1, 2019, to the date of sentencing. Although the restitution statute is silent on the issue of prejudgment interest, courts in the First Circuit have recognized prejudgment interest is an appropriate component of criminal restitution. In an unpublished case about bank fraud, the First Circuit explained that mandatory restitution "aims to provide victims with full and fair compensation, rendering the return of the principal loan amount inadequate because 'foregone interest is one aspect of the victim's actual loss.'" *Corey*, 77 F. App'x at 12 (quoting *United States v. Smith*, 944 F.2d 618, 626 (9th Cir. 1991)); *see also United States v.*

*Innarelli*, 524 F.3d 286, 293 (1st Cir. 2008) ("[T]he purpose of restitution is . . . to make the victim whole again by restoring to it the value of the losses it suffered as a result of the defendant's crime."); *United States v. Latorella*, No. 10-10388-DPW, 2017 U.S. Dist. LEXIS 98849, at *4 n.1 (D. Mass. June 27, 2017) ("[A]s a legal matter prejudgment interest is available as part of a restitution order designed to make victims whole by compensating them for the lost time value caused by delay in receiving restitution of the core underlying loss.").

Other courts of appeal have reached the same conclusion. *See, e.g., United States v. Fumo*, 655 F.3d 288, 321 (3d Cir. 2011) (holding that court may "award prejudgment interest in order to recoup the time-value of the victim's loss"); *United States v. Rochester*, 898 F.2d 971, 983 (5th Cir. 1990) (holding that "pre- and postjudgment interest may be awarded" as part of criminal restitution); *United States v. Shepard*, 269 F.3d 884, 886 (7th Cir. 2001) (explaining that "return of the same number of dollars would be 'inadequate' for purposes of § 3663A(b)(1)(A) because the [stolen] money came from an interest-bearing account."); *United States v. Arnold*, 701 F. App'x 702, 706 (10th Cir. 2017) (allowing prejudgment interest).

In line with the statutory goal of making victims whole, and consistent with the authority cited above, the Court should order prejudgment interest at the average annual federal funds effective rate for 2018 to 2023, which is 1.859 percent per year, based on publicly available rates from the St. Louis Federal Reserve Bank.[8]  The Court's orders of forfeiture and restitution should require that payment begin immediately, to start the process of making victims whole.

## VICTIM IMPACT

The government has attempted to notify all known victims of the scheme to defraud, but it has not received responses from most parent victims.  With this memorandum, the government has

---

[8] Federal Funds Effective Rate (FEDFUNDS) | FRED | St. Louis Fed (stlouisfed.org).

submitted 10 letters to the Court from victims, along with voluminous restitution claims submitted by the victims that underlie the government's restitution request as detailed above.

Under 18 U.S.C. § 3771(a)(4), all victims have the right reasonably to heard at the defendant's sentencing. The government currently is not aware of any victims who wish to address the Court in person at sentencing.

## SENTENCING EXHIBITS AND EVIDENCE

To resolve disputed issues at sentencing, the government will principally rely on testimony this Court heard at trial and the following sentencing exhibits submitted with this memorandum:

Admitted Trial Exhibits 6, 10, 13, 15, 22, 30, 31, 79, 82, 84, 86, and 87.
Marked Trial Exhibits BW and BX;
Affidavit of Farid Kiblawi (attaching Exhibits BW and BX);
Affidavit of Harrison Smalbach;
Affidavit of John Harger;
Addition Victim Summary Chart;
Victim Questionnaire Response Binder (index included);
Victim Impact Statement Binder (index included);
Victim Restitution Affidavits (index included);
Sample Georgia and Florida Parent Emails; and
DT Interview Report.

The government respectfully requests the opportunity to offer additional evidence from previously admitted or marked trial exhibits, as needed in response to the defendant's arguments.

## CONCLUSION

For the reasons stated above, the Court should impose the sentence recommended by the government, including forfeiture and restitution, because it is necessary to provide just punishment and to protect the public from further criminal conduct by this defendant and to provide relief to the victims of the defendant's scheme to defraud.

|  | Respectfully submitted, |
|---|---|
|  | JOSHUA S. LEVY<br>Acting United States Attorney |
| By: | /s/Kriss Basil<br>KRISS BASIL<br>ALATHEA PORTER<br>Assistant United States Attorneys<br>U.S. Attorney's Office<br>District of Massachusetts |

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/Kriss Basil
KRISS BASIL
Assistant U.S. Attorney